UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ASSOCIATED INDUSTRIES INSURANCE COMPANY, INC., a Florida Insurance Company, | No.: |
| Plaintiff, | **COMPLAINT** |
| v. | JURY DEMAND |
| COMMUNITAS, INC., a Texas Corporation; WEBTPA EMPLOYEE SERVICES, LLC, a Texas Limited Liability Company, and INLAND NORTHWEST RENAL CARE GROUP, LLC d/b/a NORTHPOINTE DIALYSIS, a Washington Limited Liability Company, | |
| Defendant. | |

Plaintiff Associated Industries Insurance Company, Inc. ("Associated"), by and through its undersigned counsel, hereby files this Complaint against Defendants Communitas, Inc. ("Communitas"), WebTPA Employer Services, LLC ("WebTPA"), and Inland Northwest Renal Care Group, LLC d/b/a Northpointe Dialysis ("Northwest"), and alleges on information and belief as follows:

COMPLAINT
NO.: _____

PAGE 1

**Bullivant|Houser|Bailey PC**
925 Fourth Avenue, Suite 3800
Seattle, Washington 98104
Telephone: 206.292.8930

# I.  NATURE OF ACTION

1.1    This insurance coverage action relates to AmTrust Pro Exec Insurance Policy Number AES1189645 02, issued by Associated to Communitas and WebTPA for the policy period from June 6, 2019 to June 6, 2020 (the "Policy").  Associated seeks a judicial declaration that WebTPA is not entitled to coverage or defense under the Policy for a lawsuit brought against it by Northwest, currently pending in the United States District Court for the Western District of Washington, No. 2:19-cv-01758-JCC-MAT (the "Northwest Suit").

# II.  PARTIES

2.1    Plaintiff Associated is an insurance company organized and existing under the laws of the State of Florida, with its principal place of business in Boca Raton, Florida.

2.2    Communitas is a Texas corporation with its principal place of business at 8500 Freeport Parkway South, Suite 400, Irving, Texas 75063.

2.3    WebTPA is a Texas limited liability company, wholly owned by Communitas, with its principal place of business also at 8500 Freeport Parkway South, Suite 400, Irving, Texas 75063.  Based on Associated's review of publicly available documents, including the Notice of Removal filed by WebTPA in the Northwest Suit, Associated avers that Communitas is the only member of WebTPA.

2.4    Based on Associated's review of publicly available documents, including the First Amended Complaint in the Northwest Suit, Northwest is a Washington limited liability company with its principal place of business at 101 West 8th, Spokane, Washington 99220.  Dkt. #22 at ¶ 2.1.

# III.  JURISDICTION & VENUE

3.1    The parties are of diverse citizenship, and jurisdiction is appropriate in this Court pursuant to 28 U.S.C. § 1332.

3.2    The amount in controversy exceeds $75,000, exclusive of interest and costs.  As set forth below, the Policy that is the subject of this action has a limit of liability of $3,000,000

COMPLAINT
NO.: _____

PAGE 2

**Bullivant|Houser|Bailey PC**
925 Fourth Avenue, Suite 3800
Seattle, Washington 98104
Telephone: 206.292.8930

per claim, $3,000,000 aggregate, and the Northwest Suit, in which WebTPA is named as a defendant, involves alleged damages that, upon information and belief, are substantially in excess of $75,000.

3.3     Pursuant to 28 U.S.C. § 1391, venue is proper in the Western District of Washington because the contracts that govern the services that are at issue in the Northwest Suit were entered into in King County.

## IV.  FACTUAL BACKGROUND

### WebTPA and its Administrative Services Agreement with the Spokane Tribe of Indians

4.1     WebTPA offers administrative services for group health plans, a service that entails processing patient claims and affording its customers access to a network of medical providers.

4.2     One of WebTPA's professed areas of expertise is to serve as a claims administrator for group health plans established by tribal entities, including both American Indian and Alaska Native tribes.  In such instances, WebTPA enters into an "administrative services agreement" with a particular client tribe, pursuant to which WebTPA's main function is to pay claims in accordance with the applicable tribal plan.  WebTPA does not, in such instances, serve as a plan fiduciary or plan administrator under the Employee Retirement Income Security Act ("ERISA"), nor does it assume ultimate financial responsibility for the payment of benefits.  Those responsibilities remain with the tribe.

4.3     On or about September 1, 2012, WebTPA entered into an Administrative Services Agreement (the "ASA") with the Spokane Tribe of Indians (the "Tribe"), which had established a self-funded employee welfare benefit plan within the meaning of ERISA.

4.4     Subject to all of its terms and conditions, the ASA provided that WebTPA would provide "certain services with respect to the Plan" but that the Tribe did not delegate to WebTPA any discretionary authority for the administration of the plan nor assign to WebTPA

COMPLAINT
NO.: _____

PAGE 3

**Bullivant|Houser|Bailey PC**
925 Fourth Avenue, Suite 3800
Seattle, Washington 98104
Telephone: 206.292.8930

any of the Tribe's responsibilities as a "Plan Fiduciary" or "Plan Administrator" under ERISA. WebTPA also agreed to provide the Tribe with access to a network of medical providers.

4.5     As part of its provision of network access to the Tribe, WebTPA entered into a "Payor Contract" with First Choice Health Network, Inc. ("First Choice").  First Choice operates an independent Preferred Provider Organization ("PPO") in the Northwestern United States that serves self-funded employee welfare benefit plans.  A PPO is a managed-care organization under which medical professionals and facilities agree to render subscribed participants services at an agreed-upon reduced rate.  First Choice thus entered into "Provider Agreements" with medical facilities and health care providers, thus creating the network.

4.6     At all times relevant to this dispute, Northwest was a provider in the First Choice network pursuant to a Provider Agreement.

## The Northwest Suit

4.7     On or about September 30, 2019, Northwest filed the Northwest Suit against WebTPA in the Superior Court for King County, State of Washington.  Subsequently, WebTPA successfully removed the Northwest Suit to the United States District Court for the Western District of Washington, where it remains pending under Case No. 2:19-cv-01758-JCC-MAT.  A First Amended Complaint (the "FAC") was filed on or about November 22, 2019 (Dkt. #22), and remains the operative pleading.  A true and correct copy of the FAC is attached hereto as Exhibit A.

4.8     As described in the FAC, the Northwest Suit "arises from Defendant WebTPA's failure and refusal to pay [Northwest] at the contractually agreed upon rates for the outpatient renal dialysis and related services Northwest has provided, and continues to provide, to a specific patient . . . ."  FAC ¶ 1.1.

4.9     Northwest asserts that WebTPA "is obligated to pay Northwest for its treatment of the Network Patient in accordance with the rate schedule set forth in Northwest's agreement with First Choice ('Network Rates')."  *Id.* ¶ 1.2.

COMPLAINT
NO.: _____

PAGE 4

**Bullivant|Houser|Bailey PC**
925 Fourth Avenue, Suite 3800
Seattle, Washington 98104
Telephone: 206.292.8930

4.10     Northwest asserts that "WebTPA . . . [has] regularly failed and refused to fulfill [its] contractual obligations" and "[s]pecifically, has failed and refused to pay Northwest . . . at the Network Rates for the outpatient renal dialysis and related services Northwest provided to Patient X." *Id.* ¶ 1.4.  As Northwest asserts, the Northwest Suit is "solely about the ***rate of payment*** at which it should have been reimbursed pursuant to the Defendants' contractual and legal obligations." *Id.* ¶ 1.6 (emphasis in original).

4.11     Northwest asserts further that "in a telephone call . . . WebTPA specifically assured Northwest that Patient X was a Network Patient and that payment for the outpatient renal dialysis and related services Northwest provided to Patient X would be paid at Network Rates." *Id.* ¶ 1.3.

4.12     As Northwest has stated in another pleading on file in the Northwest Suit, "the entire premise of Northwest's lawsuit is that it does not want the plan benefits – but rather the higher rates that WebTPA *contracted to pay Northwest and further represented it would pay in communications prior to Northwest beginning treatment.*"  Northwest's Response to Motion to Dismiss [Northwest Suit Dkt. # 33 at p. 2 (emphasis added)].

4.13     Northwest asserts that it sent an initial letter to WebTPA on or about December 14, 2017, "notifying WebTPA that it had underpaid Northwest for services Northwest provided to Patient X," FAC ¶ 4.46, and followed up with correspondence "demanding that WebTPA reimburse Northwest at the applicable Network Rates for the services it provided to Patient X," including letters dated "February 21, 2018, April 2, 2018, June 1, 2018, September 27, 2018, and January 7, 2019." *Id.* ¶ 4.47.  True and correct copies of these letters are attached hereto as composite Exhibit B.

4.14     Northwest's First Cause of Action for "Breach of Network Agreement" contends that "WebTPA materially breached the terms of the Network Agreement" by, *inter alia*, failing to pay claims at Network Rates.  FAC ¶ 5.12.

COMPLAINT
NO.: _____

PAGE 5

**Bullivant|Houser|Bailey PC**
925 Fourth Avenue, Suite 3800
Seattle, Washington 98104
Telephone: 206.292.8930

Case 2:21-cv-00708-LK   Document 1   Filed 05/28/21   Page 6 of 19

4.15    The Second Cause of Action for "Breach of Contract as Third Party Beneficiary of Payor Contract" likewise asserts that "WebTPA has materially breached the Payor Contract" by, *inter alia*, failing to pay claims at Network Rates. *Id.* ¶ 6.16.

4.16    The Fourth Cause of Action[1] for "Breach of the Implied Covenant of Good Faith and Fair Dealing" asserts that "[t]he Provider Contract, the Payor Contract, and the Network Agreement are valid and enforceable contracts between Northwest, First Choice, and WebTPA," *id.* ¶ 8.2, that there is an implied covenant of good faith and fair dealing in each of those contracts, and that WebTPA has breached that implied contractual term because it "has not reimbursed Northwest for its treatment of Patient X at the Network Rates . . . ." *Id.* ¶ 8.8.

4.17    A Fifth Cause of Action for "Promissory Estoppel" asserts that "WebTPA did not in fact reimburse Northwest at the Network Rates for the services it provided to Patient X" as WebTPA purportedly had promised to do. *Id.* ¶ 9.11.

4.18    A Sixth Cause of Action for "Breach of Implied-in-Fact Contract" asserts that "WebTPA and Northwest had a mutual, binding understanding that Northwest was contractually obligated to provide dialysis services to Patient X in exchange for payment by WebTPA at the Network Rates," *id.* ¶ 10.2, and that "WebTPA breached its implied-in-fact contract with Northwest by failing to properly reimburse Northwest for the services it provided to Patient X at the Network Rates." *Id.* ¶ 10.15.

4.19    A Seventh Cause of Action for "Declaratory Judgment Pursuant to Wash. Rev. Code § 7.24.020," asserts that there is a controversy "concerning WebTPA and First Choice's contractual and legal obligations under, inter alia, the Payor Contract, the Provider Contract, and the Network Agreement," and that "Northwest contends that . . . WebTPA is required to reimburse Northwest at the Network Rates for the services it provided to Patient X . . . ." *Id.* ¶ 11.2.

---

[1] The FAC's Third Cause of Action is asserted solely against First Choice.

COMPLAINT
NO.: _____

PAGE 6

Bullivant|Houser|Bailey PC
925 Fourth Avenue, Suite 3800
Seattle, Washington 98104
Telephone: 206.292.8930

4.20    The "Prayer for Relief" asks that the court, in connection with the First, Second, Fourth, Fifth, Sixth, and Seventh Causes of Action "award damages to Northwest in an amount equal to the difference between: (a) the amount WebTPA has already reimbursed Northwest for the services it provided to Patient X, and (b) the Network Rates set forth in Schedule B of the Provider Contract for those services" *Id.* at Prayer for Relief ¶ A.

4.21    In short, the entire gravamen of the Northwest Suit concerns the seemingly straightforward issue of what amount WebTPA was contractually obligated to pay to Northwest for the services Northwest provided.

4.22    Moreover, the Northwest Suit does not allege negligence of any sort, but rather, alleges solely WebTPA's entirely voluntary and deliberate decisions about what amounts it was and was not required to pay to Northwest for the services it provided to Patient X.

4.23    As shown below, such claims are not covered under the Policy.

## **THE POLICY**

4.24    The Policy was issued by Associated Industries Insurance Company, Inc. ("Associated"), and is the first policy Associated or any of its affiliates ever issued to Communitas and/or WebTPA.  A true and correct copy of the Policy (including the "Claim Definition Amendment Endorsement," which was agreed to between the parties subsequent to the initial issuance of the Policy) is attached hereto as Exhibit C.

4.25    The Policy, subject to all of its terms, conditions, and limitations, generally affords professional liability coverage, referred to in the Policy as "Miscellaneous Liability Coverage," and was effective for the Policy Period[2] from June 6, 2019 to June 6, 2020.  It is subject to a limit of liability of $3,000,000 per claim, $3,000,000 aggregate, with a self-insured retention of $200,000 per claim.  *See* Ex. 3, Policy, Declarations.  There are a number of Policy provisions that are potentially pertinent here.

---

[2] Capitalized terms and terms appearing in **bold font** not otherwise defined herein are defined in the Policy.

4.26   The Policy's Insuring Agreement provides, in pertinent part, that Associated "shall pay **Damages** . . . that the **Insured** shall become legally obligated to pay as a result of a **Claim** made against the **Insured** for a **Wrongful Act** . . . ."  Policy, Miscellaneous Liability Coverage Part, § I. Insuring Agreement, A. Miscellaneous Professional Liability.

4.27   "**Wrongful Act**" is defined as "any actual or alleged *negligent* act, error or omission committed or attempted solely in the performance of or failure to perform **Professional Services** . . . ."  *Id.* § II. Definitions W. "Wrongful Act" (emphasis added).

4.28   The Exclusions of the Policy's Miscellaneous Liability Coverage Part provide that Associated "shall not be liable to pay any **Loss** [which is defined to include both **Damages** and **Claim Expenses**] arising from any **Claim** . . .  based upon, arising from, or in consequence of breach of any express . . . representation . . . or *breach of any other contractual obligation which goes beyond an express or implied duty to exercise a degree of care* [or] skill as is consistent with applicable industry standards."  Policy, Miscellaneous Liability Coverage Part, § III. Exclusions, P.

4.29   The Policy's definition of potentially covered "Damages" expressly excludes "any amount which may be deemed uninsurable under the law pursuant to which this Policy shall be construed, including but not limited to damages or settlements which are in the nature of restitution, disgorgement or the return of ill-gotten gains."  Miscellaneous Liability Coverage Part, § II. Definitions F. "Damages" subparagraph 5.

4.30   The Policy's "Affirmative Fiduciary Coverage Endorsement" modifies the Policy's definition of "Professional Services" in connection with certain types of Claims involving ERISA and service as a fiduciary.  The Endorsement modifies the definition of "Professional Services" so as to include "Professional Supervision" and "Fiduciary Acts."  Affirmative Fiduciary Coverage Endorsement, modification of § II. Definitions, P.

4.31   "Professional Supervision" is defined to include various functions concerning "supervisory procedures required by law, regulation, governmental or regulatory authority,

COMPLAINT
NO.: _____

PAGE 8

**Bullivant|Houser|Bailey PC**
925 Fourth Avenue, Suite 3800
Seattle, Washington 98104
Telephone: 206.292.8930

and/or self-regulatory authority." *Id.* at Definition Z.

4.32   "Fiduciary Act" refers to breaches of duties imposed on an Insured "as a fiduciary of any **Plan** . . ." by ERISA, HIPAA, or "any law of the United States or other jurisdiction," "other matter claimed against any **Insured** solely because of the Insured's service as a fiduciary of any **Plan**," any "act, error or omission solely in the **Administration** of a **Plan,"** or "**Professional Services** as a fiduciary for others for a fee." *Id.* at Definition Y.

4.33   The Affirmative Fiduciary Coverage Endorsement adds a specific further exception to the definition of "Damages" such that potentially covered Damages do not include "**Benefits** due or that are to become due under any **Plan** if such benefits were the sole responsibility of the **Insured**'s client and the **Plan** complied with all applicable laws." The Endorsement defines "Benefits" as "retirement, health or welfare **Plans** established by the **Insured's** client for employees of the **Insured's** client." Affirmative Fiduciary Coverage Endorsement at Definitions, X.

4.34   The Affirmative Fiduciary Coverage Endorsement also adds an exclusion that precludes coverage for any "Claim" (including any associated Defense Expenses) that is "based upon, arising out of, or attributable to any prior or pending written demand for monetary damages . . . against any **Insured** as of the applicable Prior Litigation Date set forth in the Declarations, or the same or substantially the same facts, circumstances or situations underlying or alleged therein." Affirmative Fiduciary Coverage Endorsement at Exclusion W1.

4.35   A separate Endorsement, the Professional Services Definition Amendment Endorsement, amends the definition of "Professional Services" in the Miscellaneous Liability Coverage Part, defining Professional Services also to include, *inter alia*, services provided as "Third Party Administrator, Employee Benefit Plan Administrator, [or] Professional Claims Administrator, of any Employee Benefit Plan." Miscellaneous Liability Coverage Part, § II. Definitions, P, as amended by the Professional Services Definition Amendment Endorsement.

COMPLAINT
NO.: _____

PAGE 9

**Bullivant|Houser|Bailey PC**
925 Fourth Avenue, Suite 3800
Seattle, Washington 98104
Telephone: 206.292.8930

4.36     In order for coverage to be triggered under the Policy, the Insuring Agreement requires that the **"Claim"** in question be made "during the **Policy Period**."  Miscellaneous Professional Liability Coverage Part, § I. Insuring Agreements A.

4.37     Under the "Claim Definition Amendment Endorsement," "**Claim**" means, in pertinent part, "any written notice received by any **Insured** that a person or entity . . . intends to hold an Insured responsible for a **Wrongful Act** . . . ."  The Endorsement further provides that "[a] **Claim** will be deemed to be made when such written notice is first received by the President, Chief Executive Officer, Chief Financial Officer, member of the legal department, or member of the risk management department of the **Insured**."  Miscellaneous Liability Coverage Part, § II. Definitions, D, as amended by the Claim Definition Amendment Endorsement.

## V.  FIRST CAUSES OF ACTION

**DECLARATORY JUDGMENT OF NON-COVERAGE FOR WEBTPA IN CONNECTION WITH THE NORTHWEST SUIT BECAUSE AMOUNTS THAT MAY BE ORDERED TO BE PAID PURSUANT TO CONTRACTUAL OBLIGATIONS DO NOT CONSTITUTE DAMAGES THAT WEBTPA IS "LEGALLY OBLIGATED TO PAY AS A RESULT OF A CLAIM"**

5.1     Each of the allegations above is incorporated herein by reference.

5.2     The Policy's Insuring Agreement provides, in pertinent part, that Associated "shall pay **Damages** . . . that the **Insured** shall become legally obligated to pay as a result of a **Claim** made against the **Insured** for a **Wrongful Act** . . . ."  Policy, Miscellaneous Liability Coverage Part, § I. Insuring Agreement, A. Miscellaneous Professional Liability.

5.3     Under Texas law, the term "legally obligated to pay" has been determined to refer only to tort liability, not contractual liability.

5.4     Thus, the fundamental relief that Northwest seeks – recovery of the difference between what it claims it was owed by WebTPA under governing contractual obligations and what it was actually paid by WebTPA – would not qualify as an amount that WebTPA "shall

COMPLAINT
NO.: _____

PAGE 10     **Bullivant|Houser|Bailey PC**
925 Fourth Avenue, Suite 3800
Seattle, Washington 98104
Telephone: 206.292.8930

become legally obligated to pay as a result of a **Claim**."

5.5     Accordingly, Associated is entitled to a declaratory judgment that it has no duty to indemnify or defend WebTPA because the amounts sought in the Northwest Suit are not, even if awarded, amounts that WebTPA will have become "legally obligated to pay as a result of a **Claim**."

## VI.  <u>SECOND CAUSE OF ACTION</u>

**DECLARATORY JUDGMENT OF NON-COVERAGE FOR WEBTPA IN CONNECTION WITH THE NORTHWEST SUIT BECAUSE THE NORTHWEST SUIT DOES NOT ALLEGE ANY POTENTIALLY COVERED WRONGFUL ACT**

6.1     Each of the allegations above is incorporated herein by reference.

6.2     The Policy's Insuring Agreement provides, in pertinent part, that the Policy responds to "**Damages** . . . as a result of a **Claim** made against the **Insured** for a **Wrongful Act** . . . ."  Policy, Miscellaneous Liability Coverage Part, § I. Insuring Agreements, A.

6.3     "**Wrongful Act**" is defined as "any actual or alleged *negligent* act, error or omission committed or attempted solely in the performance of or failure to perform **Professional Services** . . . ."  *Id.* § II. Definitions W. "Wrongful Act" (emphasis added).

6.4     The Northwest Suit is devoid of any allegation or suggestion that WebTPA acted "negligently" in connection with the disputes at issue.  To the contrary, Northwest consistently alleges that WebTPA made a conscious and intentional decision to refuse Northwest's demands.  The Northwest Suit does not allege any "Wrongful Act" by WebTPA. Therefore, the Policy does not afford any potential coverage for the Northwest Suit because it is not within the scope of the Policy's pertinent Insuring Agreement.

6.5     Accordingly, Associated is entitled to a declaratory judgment that it has no duty to indemnify or defend WebTPA because the Northwest Suit does not allege negligence and therefore does not allege any "Wrongful Act" as required to trigger potential coverage under the Policy.

COMPLAINT NO.: _____

PAGE 11

**Bullivant|Houser|Bailey PC**
925 Fourth Avenue, Suite 3800
Seattle, Washington 98104
Telephone: 206.292.8930

## VII.  THIRD CAUSE OF ACTION

**DECLARATORY JUDGMENT OF NON-COVERAGE FOR WEBTPA IN CONNECTION WITH THE NORTHWEST SUIT BECAUSE COVERAGE IS BARRED BY EXCLUSION P (THE "BREACH OF CONTRACT EXCLUSION")**

7.1     Each of the allegations above is incorporated herein by reference.

7.2     The Exclusions of the Policy's Miscellaneous Liability Coverage Part provide that Associated "shall not be liable to pay any **Loss** [which is defined to include both **Damages** and **Claim Expenses**] arising from any **Claim** . . .  based upon, arising from, or in consequence of breach of any express . . . representation . . . or breach of any other contractual obligation which goes beyond an express or implied duty to exercise a degree of care [or] skill as is consistent with applicable industry standards."  Policy, Miscellaneous Liability Coverage Part, § III. Exclusions, P.

7.3     Northwest asserts that WebTPA is liable because it made certain "express representations" about the scope of what it would pay ("WebTPA specifically assured Northwest that Patient X was a Network Patient and that payment for the outpatient renal dialysis and related services Northwest provided to Patient X would be paid at Network Rates," FAC ¶ 1.3).

7.4     In addition, Northwest pervasively asserts that WebTPA's failure to pay Network Rates was a breach of WebTPA's contractual obligations.

7.5     Accordingly, even if the amounts sought by Northwest could, if part of a court judgment, be deemed amounts that WebTPA had become "legally obligated to pay," Associated is entitled to a declaration that it has no duty to indemnify or defend WebTPA because Exclusion P bars coverage for any and all claims for such amounts (and any Claim Expenses incurred in the defense of such claims).

COMPLAINT
NO.: _____

PAGE 12     **Bullivant|Houser|Bailey PC**
925 Fourth Avenue, Suite 3800
Seattle, Washington 98104
Telephone: 206.292.8930

## VIII.   FOURTH CAUSE OF ACTION

**DECLARATORY JUDGMENT THAT COVERAGE FOR WEBTPA IS BARRED BECAUSE THE RELIEF SOUGHT IS FUNDAMENTALLY RESTITUTIONARY IN NATURE AND UNINSURABLE UNDER TEXAS LAW**

8.1     Each of the allegations above is incorporated herein by reference.

8.2     The Policy's definition of potentially covered "Damages" expressly excludes "any amount which may be deemed uninsurable under the law pursuant to which this Policy shall be construed, including but not limited to damages or settlements which are in the nature of restitution, disgorgement or the return of ill-gotten gains."   Miscellaneous Liability Coverage Part, § II. Definitions F. "Damages" subparagraph 5.

8.3     Restitution and disgorgement are uninsurable under Texas law.

8.4     Northwest, in seeking to recover from WebTPA the alleged value of the services it parted with in performing its contract, fundamentally seeks relief that it restitutionary in nature and not within the Policy's definition of potentially covered "Damages."

8.5     Accordingly, Associated is entitled to a declaratory judgment that it has no duty to indemnify or defend WebTPA because the Northwest Suit is not a Claim for potentially covered "Damages" as that term is defined in the Policy, and therefore is outside the scope of the Policy's Insuring Agreement.

## IX.   FIFTH CAUSE OF ACTION

**DECLARATORY JUDGMENT THAT THE AFFIRMATIVE FIDUCIARY COVERAGE ENDORSEMENT DOES NOT AFFORD ANY POTENTIAL COVERAGE FOR THE NORTHWEST SUIT**

9.1     Each of the allegations above is incorporated herein by reference.

9.2     The Policy's "Affirmative Fiduciary Coverage Endorsement" modifies the Policy's definition of "Professional Services" in connection with certain types of Claims involving ERISA and the Insureds' service as a fiduciary.  The Endorsement modifies the

COMPLAINT
NO.: _____

PAGE 13

**Bullivant|Houser|Bailey PC**
925 Fourth Avenue, Suite 3800
Seattle, Washington 98104
Telephone: 206.292.8930

definition of "Professional Services" so as to include "Professional Supervision" and "Fiduciary Acts." Affirmative Fiduciary Coverage Endorsement, modification of § II. Definitions, P.

9.3     Under the Affirmative Fiduciary Coverage Endorsement, "Professional Supervision" is defined to include various functions concerning "supervisory procedures required by law, regulation, governmental or regulatory authority, and/or self-regulatory authority." *Id.* at Definition Z.

9.4     Similarly, "Fiduciary Act" is defined to refer to breaches of duties imposed on an Insured "as a fiduciary of any **Plan** . . ." by ERISA, HIPAA, or "any law of the United States or other jurisdiction," "other matter claimed against any **Insured** solely because of the Insured's service as a fiduciary of any **Plan**," any "act, error or omission solely in the **Administration** of a **Plan,"** or "**Professional Services** as a fiduciary for others for a fee." *Id.* at Definition Y.

9.5     The Northwest Suit is devoid of any assertion that WebTPA engaged in "Professional Supervision" or any "Fiduciary Act" as those terms are defined in the Affirmative Fiduciary Coverage Endorsement.

9.6     Moreover, the ASA between WebTPA and the Tribe expressly provides that the Agreement "does not give WEB-TPA any discretionary responsibility or authority for the administration of the Plan nor assign Employer's 'Plan Administrator' responsibilities under ERISA to WEB-TPA." ASA ¶ 1.2. It further provides that the Tribe shall "[r]etain all responsibilities of employer, administrator, plan sponsor, and named fiduciary, as those terms are defined or used in ERISA." *Id.* ¶ 3.2.

9.7     The Affirmative Fiduciary Coverage Endorsement is therefore inapplicable to the particular claims at issue in the Northwest Suit.

9.8     Nonetheless, even assuming, solely for the sake of discussion, that the claims at issue in the Northwest Suit could be deemed to involve "Fiduciary Acts" within the

meaning of the Affirmative Fiduciary Coverage Endorsement, coverage would still be barred on multiple grounds.

9.9     First, the Affirmative Fiduciary Coverage Endorsement does not in any way alter the requirement of the Policy's Insuring Agreement, to the effect that coverage applies only to amounts that WebTPA becomes "legally obligated to pay" as a result of a Claim for a Wrongful Act.

9.10    Second, the modified definition of "Damages" applicable to coverage afforded by the Affirmative Fiduciary Coverage Endorsement still requires that Damages be a "compensatory sum which the **Insured** becomes legally obligated to pay," and expressly excludes uninsurable and/or restitutionary amounts.

9.11    Third, the Affirmative Fiduciary Coverage Endorsement adds a specific further exception to the definition of "Damages" such that potentially covered Damages do not include "**Benefits** due or that are to become due under any **Plan** if such benefits were the sole responsibility of the **Insured**'s client and the **Plan** complied with all applicable laws."

9.12    The Affirmative Fiduciary Coverage Endorsement defines "Benefits" as "retirement, health or welfare **Plans** established by the **Insured's** client for employees of the **Insured's** client." Affirmative Fiduciary Coverage Endorsement at Definitions, X.

9.13    Notwithstanding Northwest's insistence that it is not suing "under ERISA to recover benefits under Patient X's health plan," the amounts in controversy – namely, the difference between the amounts that WebTPA paid to Northwest (on behalf of the Tribe) and the amount that Northwest claims it was entitled to receive – are, *in fact*, Patient X's "Benefits."

9.14    Further, if those Benefits were to be ordered paid by WebTPA in its role as an agent for the Tribe, the ASA confirms that such amounts would be the ultimate responsibility of the Tribe as Employer.

COMPLAINT
NO.: _____

PAGE 15     **Bullivant|Houser|Bailey PC**
925 Fourth Avenue, Suite 3800
Seattle, Washington 98104
Telephone: 206.292.8930

9.15    Accordingly, Associated is entitled to a declaratory judgment that it has no duty to indemnify or defend WebTPA because the Affirmative Fiduciary Coverage Endorsement does not afford any potential coverage for the Northwest Suit.

## X.  SIXTH CAUSE OF ACTION

**DECLARATORY JUDGMENT THAT COVERAGE FOR WEBTPA MAY BE PRECLUDED BY THE FACT THAT THE NORTHWEST SUIT DOES NOT CONSTITUTE A CLAIM MADE DURING THE POLICY PERIOD**

10.1    Each of the allegations above is incorporated herein by reference.

10.2    In order for coverage to be triggered under the Policy, the **"Claim"** in question must be made "during the **Policy Period**."  Miscellaneous Professional Liability Coverage Part, § I. Insuring Agreements, A.

10.3    Under the "Claim Definition Amendment Endorsement," "**Claim**" means, in pertinent part, "any written notice received by any **Insured** that a person or entity . . . intends to hold an Insured responsible for a **Wrongful Act** . . . ."  The Endorsement further provides that "[a] **Claim** will be deemed to be made when such written notice is first received by the President, Chief Executive Officer, Chief Financial Officer, member of the legal department, or member of the risk management department of the **Insured**."

10.4    In the present instance, WebTPA received a series of escalating demands from Northwest (or its affiliate, Fresenius Medical Care Holdings, Inc. ("Fresenius")) prior to the inception of the Policy on June 6, 2019.  These included demand letters dated December 14, 2017 (for $80,660.86), February 21, 2018 (for $237,394.99), April 2, 2018 (for $237,394.99), June 1, 2018 (for $407,194.20), September 27, 2018 (for $638,822.01), and January 7, 2019 (for $883,414.21, and carrying a subject line "FINAL Notice of Breach of Network Agreement and Violation of Medicare Secondary Payer Act").

10.5    While the first of those demand letters was written by an "A/R Specialist," all subsequent letters were written by members of Fresenius's Legal Department.  Fresenius's

COMPLAINT
NO.: _____

PAGE 16    **Bullivant|Houser|Bailey PC**
925 Fourth Avenue, Suite 3800
Seattle, Washington 98104
Telephone: 206.292.8930

April 2, 2018 letter, sent by an Assistant General Counsel, advanced very specific and technical legal arguments in support of Northwest's position, to which WebTPA responded by letter on May 10, 2018.

10.6     Associated does not yet know if any of the aforementioned correspondence was received (through direct receipt or internal forwarding) by "the President, Chief Executive Officer, Chief Financial Officer, member of the legal department, or member of the risk management department of the **Insured**" prior to the inception of the Policy Period, but intends to pursue this issue in discovery.

10.7     Accordingly, depending upon the facts that may be adduced in discovery, Associated may be entitled to a declaratory judgment that it has no duty to indemnify or defend WebTPA because the claims at issue in the Northwest Suit were in fact first asserted prior to the Policy Period and are therefore not within the Insuring Agreement of the Policy.

## XI.  <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff Associated respectfully requests that this Court enter judgment in favor of Associated and against the Defendants as follows:

A.     Under the First Cause of Action, declaring that the Policy does not provide coverage for, or require Associated to defend WebTPA in connection with the Northwest Suit because amounts that WebTPA may be ordered to pay pursuant to contractual obligations do not constitute damages that WebTPA is "legally obligated to pay as a result of a Claim";

B.     Under the Second Cause of Action, declaring that the Policy does not provide coverage for, or require Associated to defend WebTPA in connection with the Northwest Suit because the Northwest Suit does not allege negligence and therefore does not allege a "Wrongful Act" with the scope of the Policy's Insuring Agreement;

C.     Under the Third Cause of Action, declaring that the Policy does not provide coverage for, or require Associated to defend WebTPA in connection with the Northwest Suit because coverage is barred by Exclusion P;

**Bullivant|Houser|Bailey PC**
925 Fourth Avenue, Suite 3800
Seattle, Washington 98104
Telephone: 206.292.8930

D.      Under the Fourth Cause of Action, declaring that the Policy does not provide coverage for, or require Associated to defend WebTPA in connection with the Northwest Suit because the relief sought is fundamentally restitutionary in nature, uninsurable under Texas law, and therefore does not constitute potentially covered "Damages" within the scope of the Policy's Insuring Agreement;

E.      Under the Fifth Cause of Action, declaring that declaring that the Policy does not provide coverage for, or require Associated to defend WebTPA in connection with the Northwest Suit because the Affirmative Fiduciary Coverage Endorsement does afford any potential coverage for the Northwest Suit;

F.      Under the Sixth Cause of Action, declaring that, to the extent supported by evidence adduced in discovery or otherwise, the claims at issue in the Northwest Suit were made prior to the Policy Period and that the Policy does not provide coverage for, or require Associated to defend, such claims;

G.      Awarding Associated its costs and attorneys' fees; and

H.      Awarding Associated such other and further relief as this Court deems just and proper.

//

//

//

//

//

COMPLAINT
NO.: _____

PAGE 18     **Bullivant|Houser|Bailey PC**
925 Fourth Avenue, Suite 3800
Seattle, Washington 98104
Telephone: 206.292.8930

DATED:  May 28, 2021

BULLIVANT HOUSER BAILEY PC

By  */s/ Michael A. Guadagno*
    Michael A. Guadagno, WSBA #34633
    Email: michael.guadagno@bullivant.com

By  */s/ Armando Padron-Cruz*
    Armando Padron-Cruz, WSBA #55530
    Email: armando.padron-cruz@bullivant.com
    925 Fourth Ave, Suite 3800
    Seattle, Washington 98104-1129
    Phone: (206) 292-8930

SPERDUTO THOMPSON & GASSLER PLC

By: */s/ Peter G. Thompson*
    Peter G. Thompson (*pro hac vice pending*)
    Email: pthompson@stglawdc.com

By: */s/ April H. Gassler*
    April H. Gassler (*pro hac vice pending*)
    Email: agassler@stglawdc.com
    1747 Pennsylvania Avenue, N.W., Suite 1250
    Washington, DC 20006
    Phone: (202) 408-8900
    Fax: (202) 408-8910

*Attorneys for Plaintiff*

4825-5437-6940.1

COMPLAINT
NO.:  _____

PAGE 19   **Bullivant|Houser|Bailey PC**
925 Fourth Avenue, Suite 3800
Seattle, Washington 98104
Telephone: 206.292.8930